Thank you, Your Honor. David Ettinger on behalf of the Plaintiff and Appellant, BRFHH Shreveport, which I'll refer to as University Health Shreveport or UHS today. Your Honor, this is really a classic antitrust case, and our complaint tried very hard and I think succeeded in pleading an awful lot of very specific facts to support those claims. I don't think there's any doubt but that we plausibly alleged facts that would show a conspiracy, and in certain conduct that was exclusionary. The conduct in question was actions by the dominant high-priced hospital in the community, one of only three, to try to harm a turnaround hospital that was a low-priced hospital that challenged it in that way by keeping its costs up, keeping its revenues down, interfering with innovative managed care activities. And it tried to do that by interfering with the relationship between that hospital and its medical staff. LSU Health was the only medical staff for the hospital, and obviously that's an awfully intimate and important relationship. A hospital lives or dies with its doctors, yet what was done was not remotely competition on the merits, but an effort to keep LSU Health from working with UHS in a way that all hospitals do and all medical staffs do throughout America. And the facts we alleged, I'll outline here. First of all, Willis Knighton said in a written document, we have all these funds we can provide you, which you critically need because your financial situation is so bad that your accreditation is Now the document didn't explain what cooperation means. Conspirators don't often explain the details if they say things like cooperate or play ball, but we have significant facts that help fill that in, that cooperation with Willis Knighton meant don't work with UHS, don't work with the hospital where your doctors primarily practice. We know that because a couple years before, one year before, or actually less than a year before, Willis Knighton had dramatically indicated that. When LSU Health was going to meet with UHS and the OSHNA system about a possible joint venture, we know, the complaint spells it out in detail, that Dr. Marymount, the Dean of LSU Health, was called over to Willis Knighton on no notice and was said, if you go to that meeting, we're gonna cut off all your funds. Now why, why can't Willis Knighton, assuming all this is true, why can't our self-interest to fund our competitors? Well they weren't funding their competitors. Were they giving money to the hospital, right? No, the issue was not giving money to the hospital, the issue was giving money to LSU Health, to the medical staff, and they conditioned that money on LSU not performing the normal functions that a medical staff performs with its hospital. This is not a case like Trinco, remotely. Trinco is talking about how you don't have to help your rivals, and we're  reason that Willis Knighton was refusing money to UHS, that never came up, that's not the issue. What they're doing, just like in the Lorraine Journal case, Your Honor, is they're, they're refusing to deal with a supplier to their rival in order to keep that supplier from dealing with the rival. It's a classic antitrust violation, going back many years. Indeed, where that, when that's done collectively, in the boycott context, it's a per se violation of the antitrust laws. Let me ask you a question about the timeline to try to get this straight. Is it accurate that LSU sued to break its contract with BRFHH in September 2015? That goes a couple months earlier, but that's otherwise. Okay, so 2015. Was, was, did that, was that before any of the alleged anti-competitive conduct on the, on, by Willis Knighton? Yes, before the conduct of this case. They sued, the, the case was dismissed, they chose not to pursue it further. At the same time, the complaint says that they were cooperating in terms of all these kinds of internal hospital activities that were then cut off after the January 2016. They sued to break, LSU sued to break its contract with BRFHH at that point. Yes, sir. Or earlier. So, Willis Knighton, the alleged anti-competitive conduct comes after that, so how can, even assuming that everything Willis Knighton did is, even assuming all that's true, even assuming it's exclusionary conduct, how could that have caused the injury to your client? Given that LSU was already trying to get out of the relationship? They had failed to get out of the relationship and they had decided to stay in the relationship at that point in time. They brought that and they had an opportunity to try to cure the procedural problems that were the basis for the dismissal and they chose not to do so. And at that same time, Dr. Barish, who was then the Chancellor, was working and they were meeting regularly on all these internal things that medical staffs do. Willis Knighton said, we don't trust Dr. Barish. He left and Willis Knighton got Dr. Galea, who was someone who worked for Willis Knighton, his primary source of and was working for them behind the scenes as well. So what was happening then was a completely new set of circumstances after the relationship clearly was continuing. But counsel, to follow up on Judge Dunbar's question, isn't the lawsuit evidence that prior to any alleged anti-competitive conduct, LSU Health wanted out of a relationship with your client? And if that's true, because the Supreme Court has said over and over in these refusal to deal cases that defendants are perfectly capable of refusing to deal. There's not a general obligation, as they said in Trinko, to deal with anybody. And so if they had decided that they really didn't want to deal with UHS, isn't the lawsuit evidence of the fact they didn't want to deal with UHS, irregardless of any competitive conduct that may have happened later? Your Honor, I would say that might be an argument one might make on summary judgment or at trial. You're making an alternative inference from the facts, I think. And I think the inference we're making is appropriate and very well supported. Let me explain why, if I could. Number one, even while this was going on, LSU Health was still cooperating with University Health at the Conway Hospital, which, by the way, was also the subject of the effort to terminate. What's the difference? And they were achieving good results in all these areas of cooperation. What's the difference? Willis-Knighton is not in Monroe, where Conway was. When all this was done, they were cooperating with Ochsner in the next joint venture. What was the difference? They then had money, so they weren't beholden on Willis-Knighton. So it's certainly a reasonable inference here that the cooperation that was occurring, for example, they were conducting regular meetings, which were cut off after this January event. So there's a strong basis for inference that the cooperation that was occurring was due to an agreement with Willis-Knighton. Can we talk about this issue between the distinction between 12v6 and summary judgment for a second? Because there's a lot of dispute about this in the briefs. It's obviously a different standard, clearly, but the way I read Twombly, you're still obligated to plead to some facts that would exclude innocent, independent, non-collusive, non-exclusionary conduct. So Twombly, just to go through what Twombly says, it specifically points out that you have to allege some facts as an antitrust plaintiff that tend to exclude innocent explanations. That is the Matsushita standard that would otherwise apply in summary judgment. So it's not saying you apply the same legal standards. It's just saying that the pleading obligation as a matter of law is you have to meet all of the elements of your cause of action, one of which is you have to plead something that would give rise to an inference that it's not independent conduct. So I don't see – I understand that the parties disagree about this a lot, but I just don't understand how much you get from the fact that some of their cases are summary judgment cases. It's still a legal requirement. Well, yeah, we have to get – as I argued when I was a defendant recently, Your Honor, on one of these we've got to get beyond neutral territory, but I think we do. The distinction is when a defendant comes in and argues, yeah, but what about this fact that cuts the other way or that fact, that's what shouldn't be relevant here. And I think with all due respect, that's what we're talking about at the moment. We're talking about arguments about what that meant and what LSU Health was motivated by. What the complaint alleges is notwithstanding the other disputes, they were still meeting on a regular basis. They were still cooperating in areas like recruitment, and that got cut off after the Willis-Knighton proposal. And they continued even then to do it at Conway, again, subject to the – it was also subject to the termination lawsuit because Willis-Knighton wasn't there. Can I – you don't really understand the doctrinal box that we're supposed to put this case in because there's a lot of overlap, obviously, between some Section 1 claims and some Section 2 claims. This is obviously a weird-looking sort of agreement with a threat and all the rest of the facts that you put in the complaint. So let's just walk through it step by step. You agree that it's a vertical agreement. There's no horizontal agreement, so we're in the vertical agreement space. So therefore, this is a rule of reason case, not a boycott case. It's not a per se case. So all of that is beside the point. So if it's a vertical rule of reason case, don't you have to allege some impact on the relevant consumer? And who's the relevant consumer? Relevant consumer in health care antitrust cases is often described in those cases as the payer, the health plan. The health plan. So it's not your client, UHS. It's the insurance companies. But as, for example, IRITA says, it is a classic kind of antitrust violation. When you harm a competitor and that allows the market to become less competitive and therefore harms the consumer, that's an appropriate antitrust claim. No, I'm not disputing. I'm just trying to make sure I understand your argument. So in your brief, you point out to the principal points about the anti-competitive effect. Since it's a rule of reason case, that's what we're looking for. So the place where you allege those are principally starting at page 70 of the record. It's paragraph roughly 174 of your complaint. Can you help me see sort of what is the effect on the health plans of the allegedly exclusionary conduct? Well, one in particular, Your Honor, is the most obvious, and that is the refusal by LSU Health to go with UHS to Blue Cross, as Blue Cross requested, in order to develop an innovative program that would allow them to offer a lower-priced product and better compete with Willis-Knighton with a broader range of providers. And I completely understand your allegation about the exclusionary conduct, but my question is different. My question is what is the anti-competitive effect? How did that allegedly exclusive conduct, or exclusionary conduct, impact Blue Cross Blue Shield's price, quality, patient service, anything? They couldn't offer a lower-priced program that would allow them to pay lower prices to hospitals, have more patients in that lower-priced program, have leverage to keep Willis-Knighton's prices down by virtue of that successful program? And they would have otherwise done that. This is the but-for cause of Blue Cross Blue Shields. They wanted this expanded, this narrow network but an expanded one with more people in it other than Willis-Knighton so that they could sell more, pay lower prices for much more insurance and also then say to Willis-Knighton, look at all the people who are buying this, you better cut your prices so that we don't have all these incentives to divert people elsewhere. And do you have the BCBS site handy just so I can find it in the complaint? I don't. It's in a couple of places, but when I get back up, Your Honor, I'll have it for you. Thank you. So that's one example, Your Honor, but there are many more. There's a whole series of examples of efforts, a rejection of efforts to reduce costs at UHS. And, of course, raising rivals' costs, or in this case preventing rivals from reducing their costs, is a classic antitrust violation, a classic anti-competitive effect because the rival is then unable to cut prices and be more competitive. And Willis-Knighton was very cognizant, as the complaint says, of the fact that it was the high-priced competitor, and this guy coming along and now competing for commercial patients for the first time was the low-priced competitor. Similarly, efforts to cut revenues at UHS because it wouldn't allow it to expand these programs, some of which would have resulted in more productivity, more patients seen, which in itself would have been a pro-competitive effect, Your Honor, because more patients would have been able then to utilize the services. But beyond that, it increased the market share of an already dominant high-priced firm and cut the ability of this low-priced firm to compete more vigorously and cut into that market share. And, you know, as the HHI standards explain, the complaint goes through that, that is widely considered a significant anti-competitive effect. So, Your Honor, essentially, I mean, Willis-Knighton was trying to put a spoke in the wheels, effectively, of the efforts by UHS and LSU and stop that in a way that isn't remotely competition on the merits. It's not like they were trying to compete for the LSU Health Physicians affiliation here. They just wanted to stop that cooperation in a way that had anti-competitive effects in several respects. Counsel, in our Section 2 cases allow inferring anti-competitive conduct when a monopolist has no rational business purpose other than its adverse effects on competition. A monopolist is doing that. So, I read your brief as saying that the economically irrational activity here was Willis-Knighton's decision not to donate $50 million to LSU. Is that right? I would say several things on this. It may take a little of my 15 minutes, my extra 5 minutes to answer your question. Number one, I don't think that applies in this situation because that is a factor, for example, in the Stearns case, where you were looking at something that was otherwise competition on the merits. Here, we're talking about something that isn't remotely competition on the merits in any way, just interfering with somebody else. So, that standard... It's about not donating the money. Is that part of the rational, economically irrational conduct? Well, the economically irrational conduct would be conditioning the donation of the money on harming a competitor. That's only rational if you harm a competitor, by definition. It's the conditioning that's key here. If Willis-Knighton had, on its own, said, we will give it or we won't give the money, that wouldn't create an issue under the antitrust laws. But when they condition it on lawful behavior, just like... Viewing your client as a competitor who's partnering with LSU, and Willis-Knighton's saying, I'm not going to donate the money. I'm not going to donate the money to somebody who's going to be my competitor. That's all they had said. Flat out, we will not donate the money. We wouldn't be here. There's a huge difference under the antitrust laws between a flat, unilateral refusal to deal and a contingent refusal to deal. That's what tying violations are, for example. And that's what we're talking about here, a refusal to deal that was contingent on the anti-competitive conduct here. And by the way, that no rational purpose test comes up as an absolute requirement in the TRNCO context when you're talking about not dealing with a rival. But again, that's not what we're talking about here. We're talking about threatening a supplier to make it not deal with a rival. And that's the Rain Journal, and that's, in other contexts, the Per Se Boycott Cases. That's a classic antitrust violation. Go ahead. No, no, no. All right, thank you. Thank you. I'll save the rest. I mean, you've saved your full five minutes for rebuttal. Thank you. Mr. Anderson? My name is Darrell Anderson. I'm here on behalf of the Appellee Willis-Knighton Medical Center. And the facts alleged by the plaintiff in this case, even construing them most favorably to the plaintiff, do not permit a plausible inference of an antitrust conspiracy between Willis-Knighton and LSU or exclusionary conduct by Willis-Knighton. The permissible inferences under Twombly and under this court's precedence that are allowed show that LSU was entitled to weigh the potential benefits of the various proposals by plaintiff against the benefits of donations from Willis-Knighton and decide on its own what was in its independent best interest. And the questions from the court about the prior litigation only, in this particular case, make that even stronger because, of course, LSU, on the face of the pleadings, had its own independent justification for not wanting to do business with the plaintiff, separate and apart from the financial incentives that it was entitled to weigh. The starting point, as the court has indicated, for analyzing a Section 1 conspiracy claim is the Supreme Court's instruction in Twombly, factual allegations that are consistent with conspiracy are not sufficient to state a claim, even at the pleading stage. Twombly requires additional facts, and it says those facts have to be evidence of a preceding agreement between the parties. And conduct, as Judge Oldham indicated, that is just as well independent action, Twombly said, is not enough. And this court has elaborated on what is required in a number of cases, including American Quarter Horse, where the court said any conduct that is as consistent with permissible competition as with illegal conspiracy cannot support a conspiracy inference, cannot support a conspiracy inference, and that applies to the summary judgment stage, it applies to the facts that are alleged in this case. Instead, what is required are facts tending to exclude the possibility of independent action. And we know from a number of decisions from this court and the Supreme Court where the courts have addressed allegations of what is a conspiracy in a vertical context, what types of facts are necessary to meet this standard, and we importantly know what types of facts are not adequate to meet this standard. So we can compare the allegations that the plaintiffs have made here to those facts, and we see that the allegations are short. The theory of coercion is based on what the complaint itself characterizes as Willis-Knighton's, quote, long-standing position. That's in the complaint. It predates plaintiffs' operation of the LSU hospital and the conspiracy alleged here. The policy alleged from the face of the complaint is that Willis-Knighton had a policy to make donations but not if the recipient intended to aid Willis-Knighton's competitors against Willis-Knighton. In Vyazas, this court recognized that proof of a preexisting policy tends to support an inference of independent conduct. So we're starting with a complaint that alleges facts that actually support an inference of independent conduct, and they've got alleged facts that support an inference of conspiracy, which they can't do. There's no allegation in this case that Willis-Knighton ever complained to LSU about all of the various proposals that is the source of their injury that they claim in this case. There's no allegation that Willis-Knighton ever complained to LSU about that, that they even knew about those. In Monsanto, from the Supreme Court in 1984, the Supreme Court said that an antitrust conspiracy cannot be inferred even when there's a specific complaint to a dealer, by a dealer to a manufacturer, encouraging that manufacturer to actually terminate the dealer relationship entirely. Of course, that's not even alleged here. But plaintiff's complaint doesn't go this far because out of all the litany of allegations that we've heard today and that we see in the complaint, there's not a single allegation that Willis-Knighton was aware of any of these proposals, that they ever complained or expressed any views about how LSU should or should not respond to those proposals. All they allege is that Willis-Knighton had this preexisting policy. Equally important, there's also no allegation of any response from LSU to Willis-Knighton reflecting an agreement. No allegation of any discussion with Willis-Knighton regarding LSU's decisions not to accept these proposals. And again, in American Quarter Horse, this court pointed out that a one-sided complaint is not a basis for an agreement. You have to have both sides. You have to have the solicitation of an agreement. You have to have the response from the other party. And that was true even in American Quarter House when one of the breeders in the case accompanied that solicitation alleged there, that complaint, by a threat to withdraw millions of dollars. So there was a financial threat in American Quarter Horse which the court said was not sufficient for an inference of conspiracy unless there was something more showing at a minimum a response by the association. And that response can't be just conforming your conduct to what was required. It has to be something more than that. Monsanto, again, says that a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination. Acquiescence is not enough. And that's as close as they can get in this case because they have no actual allegations of any communications or any facts that would support an actual agreement. And finally, as the district court noted, there are no allegations in the complaint as to when or how this supposed agreement was reached, what its scope was, how it would be implemented. It's this ethereal, we're not going to cooperate with you, which I think they've resorted to because they don't have any of the specific facts of an actual agreement. So they want to say that maybe it was this agreement not to cooperate. Well, we know from the complaint itself that the parties are cooperating. The hospital continues to run. LSU physicians continue to treat patients there. So there is cooperation going on. And what it ultimately boils down to is an allegation that they were not cooperating on whatever it was that U of H wants them not to cooperate on. And that somehow is the agreement that's alleged. There's no way to infer an antitrust conspiracy under the applicable antitrust laws from the limited facts alleged. In fact, the allegations in the complaint are perfectly consistent with LSU's independent business judgment that it would prefer to retain and perhaps even expand to significant financial donations and obtaining over and above the speculative benefits of plaintiffs' proposals. Companies make those types of choices every day. And as this court held in Vyazas, it's perfectly rational business behavior that cannot support an inference and conspiracy. In Vyazas, the manufacturer and the terminated dealer, in that case, they actually had a marketing agreement in place doing the specific thing that Vyazas wanted them to do, that Vyazas says was profitable for the manufacturer. They terminated that agreement because a whole host of orthodontists were threatening that they were going to boycott that manufacturer if it continued to do business with Vyazas. And the plaintiff in that case tried to say, well, you can't look at that side of the equation. You just have to look at the equation between Vyazas and the manufacturer. Was that profitable if they terminated that? Maybe that's against their self-interest. And what this court said is, no, no, no, you have to look at both sides, even when it was a group boycott, which isn't alleged here. And when you do that, it's not against the manufacturer's self-interest. That same reasoning applies for Square in this case. It was not against LSU's interest to decide that it wanted to seek the possibility of getting $50 million in mission support grant from Willis-Knighton and to position itself in the best way possible it could to get that. That's a perfectly legitimate decision. The complaint includes a variety of factual anecdotes. We've heard a few of them today. But none of them answer those key questions that the court's case law says has to be established. Was there solicitation of an agreement? Was there some response from the other party on that agreement? Was that agreement defined in sufficient terms to indicate the nature and scope of that agreement? We don't have any of those. And you can view any of the allegations of the complaint through that lens. We have the allegation that there was a PowerPoint presentation in 2016 where Willis-Knighton talked about funding if they would cooperate. I don't know how you get from there to any specifics of a solicitation for an agreement to do something to LSU, when LSU isn't even mentioned, and how you get from there a response from LSU back to Willis-Knighton or how you identify the scope and nature of that agreement. There's just nothing in the complaint, despite all of the nuggets of facts that they've tried to allege that meet that standard for an agreement. The Sherman Act affords all parties the right to deal or refuse to deal with whomever it likes as long as it does so independently. And Monsanto and Chwombly give teeth to that principle by policing the boundary between independent action and antitrust conspiracies and are ruling that the allegations of this complaint support an inference of a plausible antitrust conspiracy would undo those holdings. Any dealer, for instance, could claim and might even believe that a manufacturer's decision to terminate its distributorship was a bad business decision by the manufacturer. That could only make sense if that manufacturer was colluding with the distributor's competitors. And if that were all it took to establish an antitrust conspiracy, the courts would be in the role of second-guessing routine business judgments, and these guardrails that have been established in Monsanto and Diaz's and others would be eliminated. If there's no questions on that, I want to turn to Section 2 briefly, the monopolization claim. When we look at that, we see that plaintiff is required to allege conduct that is exclusionary, and there was some discussion here of the economic rationality test, and that is a test this court adopted in Stearns v. FMC where the court said generally some indication of economic irrationality is needed. And Judge Duncan, you're exactly correct. There's nothing economically irrational about refusing or declining to give millions of dollars to another party, particularly when that party is allegedly going to use that to aid your competitor in the competitive scheme. Plaintiff tries to make this a claim about whether there's competition on the merits. We know two things about this competition on the merits test in this circuit. One we know from retractable technologies and Taylor Publishing that it is not, that even acts that are business torts, tortious interference, things like that, are not exclusionary conduct. The question is, would it be, one of the questions, would it be anti-competitive conduct to threaten to cut off LSU from its donations unless LSU refused to cooperate with BRF? And Judge Smith, it cannot be anti-competitive conduct because that is perfectly rational behavior to not make a contribution to save that money when someone is going to use that against you. Their theory of competition on the merits is that if that money were given, then that would allow LSU to continue to survive the LSU health, and that they could then proceed with their agreements with LSU health, and that that would then allow them to lower prices and treat more patients. But any firm could theoretically lower its prices if its rivals were forced to subsidize its suppliers. And forced subsidization is not competition on the merits. It's the opposite. So competition on the merits allows Willis-Knighton to make the decision about who it wants to give funds to and who it doesn't. Why is the right doctrinal box not the exclusive supply contracts cases? So, and stop me if you disagree with this hypothetical. It's not really a hypothetical. It's a real case. But if a drug company is getting inputs from a supplier of the stuff it uses to make drugs, and it enters into a 10-year exclusive supply contract and says, you have to give us all of this particular chemical that we're going to use to make our drugs, and you can't give any of it to our competitors, when the drug company then sues to enforce that 10-year exclusive supply contract, that's a Section 2 violation, or at least can be if it has any competitive effect. So is that not the right box to think about the and I suppose, I mean, the thing that's interesting about it in this case, to me anyway, is that obviously a Section 2 problem, or at least raises Section 2 concerns, but it also overlaps with the Section 1 claim because if there's an agreement, a vertical agreement that has that same anti-competitive effect, you can use the same anti-competitive effect to show two different kinds of legal violation. So I guess, why is that not the right way of thinking about the case? So I think the exclusive dealing context and really the problem with this monopolization claim generally is that it's premised on this donation policy that isn't really a business activity to begin with in some ways, and so in the exclusive dealing context and in tying context and other contexts that have been discussed you have an alleged monopolist that is foregoing some type of profitable action in exchange for something else that's alleged to be wrongful that may get them more profit later. But you never have that first step when you're talking about a donation. It is never, there's no there's no refusal to do something that would ever make sense. That's Lorraine Journal also, by the way, where the plaintiff in that, or the defendant in that case was alleged to have turned down advertising because it didn't want them to do advertising with their competitor. They were turning down something that would have made them money in the abstract for anti-competitive reasons. I understand you have a whole lot of arguments that pretermit this question, so I recognize you have to go a long way down the road before we get there, but I just want to make sure before our time expires today that I understand your position on it. You don't dispute the allegations and the complaints about geographic market and product market? So the answer is we do dispute that entirely, Your Honor. We don't agree that we're a monopolist or things like that, but for purposes of this case, on this 12b6 issue, the only section 2 issue before the court is the exclusionary conduct. I'm sorry, I asked the question inartfully. What I meant to say is you don't dispute that those are properly stated in a Twombly sense so that we can take for, as a matter of given, that the relevant geographic market is Shreveport, Bossier Parish. That's correct, Your Honor. And so you don't dispute the allegations of market power as to that market? For purposes of 12b6, Your Honor. I appreciate it. The only other thing I would add, Your Honor, is we did have two alternative grounds that I just wanted to briefly touch on. One of those was North Pennington, which the district court said it didn't need to consider because of its dismissal ruling. We think that's a separate bar to their complaint, even if the court has any concerns about whether or not there was an agreement. Petitioning conduct is not covered by the Sherman Act. It's protected by the First Amendment. And importantly on this argument, plaintiffs really only make two claims about why it doesn't apply. They argue that there are two exceptions that should apply to their claims that get them out of North Pennington. One is the commercial activity exception, that this is not a real governmental action. This is a commercial action. That's been rejected by this court's decision in Greenwood Utilities. And it was confirmed in this court's decision in Bayou Fleet v. Alexander where the court says there is only one exception to North Pennington, and it's the sham exception, which they haven't alleged. The other is this coercion exception that they have tried to craft as an exception to North Pennington. Again, Bayou Fleet forecloses that by saying there's only one exception. But in addition, City of Columbia v. Omni from the U.S. Supreme Court, which said that even bribery of a public official does not get you out of the North Pennington context, would also foreclose that. The last point we made in our papers, Your Honors, that this claim is also barred by antitrust injury. That's a separate requirement that they also need to establish. And that's because the actions that allegedly cause the harm to plaintiffs are entirely divorced from the concerns of the antitrust law. And here, all plaintiffs have alleged... ...it has a lot to do with lowering prices, which can be a concern of the antitrust law. He does say that, Your Honor, but the issue here is that what plaintiffs have alleged is that Willis-Knighton coerced LSU with the potential cessation of their charitable contributions and charitable donations. But anyone could have provided those funds. You don't have to be a monopolist to provide those funds, and it doesn't really have anything to do with monopoly power. Any competitor could and likely would have done so only if...made a donation, that is, only if LSU was not going to go out and work with the rival's donors. If someone wants to get a donation from the Sam Walton Foundation, it's pretty likely that they're going to do their best to shop at Walmart and not Costco. That doesn't mean that it's an act of exclusion or a monopoly conduct. The complaint, in fact, notes that Willis-Knighton actually asked for money to help with their budgetary problems, and the plaintiff refused. And as the complaint acknowledges, the alleged coercion ended when Ochsner took over the hospital in 2018 and agreed to provide $40 million annually to LSU. But that acknowledgement is fatal to the claim of antitrust injury because it concedes that the injury-causing conduct, the alleged coercion in this case, has nothing to do with Willis-Knighton's alleged monopoly power in the relevant market. It's tied simply to Willis-Knighton's willingness to give or not give financial contributions, something any individual or firm with means could have done. And as this court said in Jebico, no antitrust violation would have occurred, but the plaintiff would have suffered the same injury, so there's no antitrust injury here. So for all these reasons, we ask for the district court to be affirmed. If the court has no further questions, I'll get back to those. We have time. We're going to talk in rebuttal about the Blue Cross Blue Shield allegations, and I just want to make sure I understand your position. So I'm looking at—there may be others that your friend will point me to, but I'm looking at the ones in 91 and 92 and 93 of the complaint that says that because of your client's conduct, Blue Cross could not offer a network that involved alternatives to Willis-Knighton at low prices except for a small segment of the population who wished to utilize Christus Highland Hospital and its physicians. Is your position on these Blue Cross allegations that—I take it you disagree that this is sufficient to state a claim. Is it because of Twombly, or is it because this is not anti-competitive conduct, or is there some other reason that I'm missing? Sorry, anti-competitive effect, I should have said. It's primarily a Twombly issue, Your Honor, because, again, we're trying to get to—or they're trying to get to an agreement. They have to have allegations that support an agreement, and there's no connection to Willis-Knighton in these paragraphs. I think it's page 38 to 40 of the record. Well, they don't need an agreement for the Section 2 claim, so that's really what I was— For the Section 2 claim, Your Honor? So the wrongdoing for the Section 2 claim is the donation policy. That's what's alleged to be exclusionary. So I think you get back to the economic rationality point that we talked about. So it can't be exclusionary under Section 2 to fail to give those funds because it's always permissible to—economically rational to not give away money. Thank you, Mr. Anderson. Mr. Ettinger? Time for a vote. Thank you, Your Honor. I'll kind of race through a few things in five minutes. First of all, Judge Oldham, I see you found the citations to the Blue Cross Blue Shield. I would say that the general allegations of anti-competitive effect at later pages also incorporate that. You know, this charity argument I think is really a misnomer in a few ways. Number one, factually, the complaint says, Willis-Knighton said, we'll provide this money. We've provided in the past in way of a number of programs. So it wasn't out of the goodness of their heart there would be programs that would benefit them, but they wouldn't do it, they said, if they didn't get cooperation. And it's very clear that that cooperation meant don't deal with the UHS. LSU Health itself said in an email eventually that there's we either have a partnership with Willis-Knighton rather than cooperate with the UHS. I think the word was collaborate. So they clearly understood that cooperation with Willis-Knighton meant no cooperation with the UHS. I think that's clear. And as to whether there's an agreement, Monsanto is our best case in a lot of ways in that issue. Because while Monsanto set a rule that said general complaints are not enough, they said threats are enough. Something that says I won't do X unless you do Y is enough, and we have that here. They said it was enough when the distributor didn't do what was desired. Monsanto came in and raised it, and the distributor said okay, and here we have Mr. Yick saying they have conceptually agreed to pay us the money after LSU Health stopped cooperating. So we can connect that dot, certainly enough for purposes of the complaint. And in Monsanto they talked about a newsletter that said we're going to all end up doing this, and here we have these reports by LSU Health saying yes, we're going to go to the mother load. We're going to go to Willis-Knighton. We're going to do that partnership rather than collaborate. So I think the agreement elements are clearly met here. And by the way, at most, Your Honor, this issue of whether LSU Health might have had a different attitude because of earlier disputes, that's got to be a summary judgment issue and not a 12B6 issue, because under 12B, the facts I've recited alone plausibly indicate that conspiracy, that they did it because of the mother load, that they did it for that reason. These documents don't say well, since we tried to terminate them before, we're not going to deal with them. They say the opposite of that, and it's right in the documents. So that inference is one that one certainly shouldn't be making, the defendant's inference, at the complaint stage. I think that's very clear. It also ignores the fact that there are 10 different instances that the complaint cites with factual detail about how LSU Health acted against its own self-interest, and not based on somebody's opinion, based on actual calculations, based on consultants' reports, based on quantified losses. The complaint goes through it in detail. So why would, even if you've been in a fight before, why would you do all that? There's more than a sufficient basis to get a conspiracy from all that. And Viasa's case, that we just heard about, is completely different. There, this court said, well, there were some complaints, but they weren't even by the defendant. And so how could you infer anything from that? And that there was no evidence that action was taken in response. Here we've got more than a complaint, a specific threat, a conditional offer. We've got action taken in response. We've got a statement saying now they've conceptually agreed. And we've got statements saying we've got a partnership with Willis-Knighton, and we're not going to collaborate with LSU Health. How could the conspiracy allegations be better? I think that's enough to get me to trial, much less past this stage, Your Honor. Your Honor, so let me talk a little bit very briefly, very briefly, about the charity and the exclusionary conduct issue. It's a little bit, it's also a misnomer to say just because it's a charitable contribution, I said that's not all it was. They're talking about programs that would benefit them, but that couldn't be exclusionary. If I'm drowning and you say, well, here's my hand, but you've got to give me your car, I'm not going to do it. Would that be coercive? Sure it would be. Tying cases, which are described as involving forcing, also clearly coercive. Tying cases, I won't sell you A unless you buy B from me. And whether it's a refusal to give money or a refusal to make a sale, it's all recognized by the antitrust laws. You know, the mere fact that this would have been money that benefited LSU Health doesn't change that at all, Your Honors. When you have a contingent offer and the contingency is an anti- competitive effect, that's a classic antitrust violation. It's not the situation in Trinco and it's not something that's viewed as simply benign. Thank you very much. Thank you, Mr. Edinger. Your case and all of today's cases are under submission and the court is in recess under the usual order.